We begin by setting out the relevant text and providing some background about its origins. We then analyze the text, together with its context and legislative history, to determine whether the legislature intended to punish defendant's conduct as first-degree theft under ORS 164.055 (1)(c). See State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) (stating interpretation methodology).
I. TEXT
Oregon law defines the crime of theft broadly. ORS 164.015 provides:
**332 "A person commits theft when, with intent to deprive another of property or to appropriate property to the person or to a third person, the person:
"(1) Takes, appropriates, obtains or withholds such property from an owner thereof;
"(2) Commits theft of property lost, mislaid or delivered by mistake as provided in ORS 164.065 ;
"(3) Commits extortion as provided in ORS 164.075 by compelling or inducing another person to deliver property;
"(4) Commits theft by deception as provided in ORS 164.085 ; or
"(5) Commits theft by receiving as provided in ORS 164.095."
Theft by receiving-the relevant act of theft here-is defined in ORS 164.095, which provides:
"(1) A person commits theft by receiving if the person receives, retains, conceals or disposes of property of another knowing or having good reason to know that the property was the subject of theft.
"* * * * *
"(3) 'Receiving' means acquiring possession, control or title, or lending on the security of the property."
ORS 164.055(1)(c) provides that a person commits the crime of theft in the first degree if the "theft is theft by receiving committed by buying, selling, borrowing or lending on the security of the property."
II. BACKGROUND
Before 1971, Oregon had several statutes that covered the various forms of unlawful property misappropriation and that incorporated the distinctions drawn between them by eighteenth-century English courts. See State v. Harris , 246 Or. 617, 618, 427 P.2d 107 (1967) (stating that that the court was required to draw a distinction between two kinds of theft because "such a distinction was drawn by" the English courts and incorporated into the Oregon statutes); Donald L. Paillette, The Oregon Theft Laws: Consolidation v. Conglomeration , 51 Or. L. Rev. 525, 525-29 (1972) (discussing **333 pre-1971 statutes). As this court explained in State v. Cox , 336 Or. 284, 82 P.3d 619 (2003), "Those statutes set out a variety of elements applicable to each offense and prescribed different-and at times inconsistent-penalties ***." Id. at 291, 82 P.3d 619 (citing Paillette, 51 Or. L. Rev. at 526-29). In 1971, following the proposal of the Oregon Criminal Law Revision Commission, the legislature "eliminated the problems arising from those separate statutes by consolidating the various forms of unlawful property deprivation into a single offense of theft that does not depend on the relationship between the thief and the owner, the type of property, or the manner of deprivation."[3] *206 Id. at 292, 82 P.3d 619 ; see ORS 164.015 (defining theft). The new statute, ORS 164.015, begins by specifying the required mental state for theft-the "intent to deprive another of property or to appropriate property to the person or to a third person." Subsections (1) through (5) then enumerate various means by which a deprivation of property may occur, some of which are defined in separate statutes. ORS 164.015(1) - (5) ; see ORS 164.065 (defining theft of lost or mislaid property); ORS 164.075 (defining extortion); ORS 164.085 (defining theft by deception); ORS 164.095 (defining theft by receiving).
By statute, the state need not specify the exact manner in which the deprivation occurred. ORS 164.025 provides:
"(1) Except for the crime of extortion, conduct denominated theft under ORS 164.015 constitutes a single offense.
**334 "(2) *** In all [cases other than theft by extortion,] an accusation of theft is sufficient if it alleges that the defendant committed theft of property of the nature or value required for the commission of the crime charged without designating the particular way or manner in which the theft was committed.
"(3) Proof that the defendant engaged in conduct constituting theft as defined in ORS 164.015 is sufficient to support any indictment, information or complaint for theft other than one charging extortion."
That statute highlights the effect of consolidation:
"[It] removes the necessity of specifying the exact manner in which the deprivation occurred. It allows a prosecutor with imperfect information to proceed against a defendant, knowing that a difference between the theft allegation in the indictment and the ultimate proof at trial will not be fatal to the state's case, because the substance of the offense-the intentional and unlawful deprivation of property-is the same."
Cox , 336 Or. at 293, 82 P.3d 619.[4] Thus, under ORS 164.025, the means by which the deprivation of property occurs is immaterial to determining whether a defendant committed theft. The defendant engages in theft whether the defendant commits the acts alleged in subsection (1) of ORS 164.015 or some other subsection of the statute.
However, when the state charges a defendant with first-degree theft under ORS 164.055(1)(c), the manner in which the deprivation occurred is crucial. The deprivation must be "theft by receiving," and, as charged here, the theft by receiving must be committed by "selling." ORS 164.055 (1)(c). As a result, it is essential to our construction of that provision that we determine the actions that the legislature intended to include in its definition of that crime, and an overview of its origins is helpful.
**335 At common law, it was not a crime to receive stolen property knowing that it was stolen. See Wayne R. LaFave, 3 Substantive Criminal Law § 20.2(a), 200 (3d ed. 2018) (discussing Dawson's Case , 80 Eng. Rep. 4 (1602) ). Persons engaged in such conduct escaped criminal liability because the only proscribed act of unlawful property misappropriation was larceny, which required an individual to take property directly from the *207 owner's possession-i.e. , a "trespass in the taking."[5] See Model Penal Code § 223.6 comment 1 at 232 (Official Draft and Revised Comments 1980) ("The historic restriction of larceny to a crime of 'trespass' against another's possession excludes the receiver, who does not himself commit a trespassory taking but acquires the property **336 by voluntary delivery from the original thief."); LaFave, 3 Substantive Criminal Law § 19.1(a) at 69 (discussing the need for a "trespass in the taking" to establish larceny). Part of Parliament's patchwork effort to address the shortcomings of the common-law crime of larceny was to create the separate crime of receiving stolen property, which was aimed at those who, although they did not initially steal the property, came into possession of it later knowing that it was stolen. LaFave, 3 Substantive Criminal Law § 19.1(b) at 74 ; id. § 20.2(a) at 200-01.
Oregon, like most states, incorporated England's law governing the separate acts of larceny and receiving stolen property. The Deady Code included both of those independent crimes. General Laws of Oregon, Crim. Code, ch. XLIV, § 547, p. 536 (Deady 1845-1864) (repealed 1971) (proscribing the act of larceny);ibr.US_Case_Law.Schema.Case_Body:v1">6 id. § 556, p. 538 (repealed 1971) (proscribing the act of receiving stolen property).[7] In discussing those crimes, this court, like many others,[8] recognized the well-settled *208 rule that a person could not be both the one who stole the property-the initial thief-and the receiver of that property. See State v. Carlton , 233 Or. 296, 297, 378 P.2d 557 (1963) (proposition that thief cannot be convicted of receiving stolen property that the thief stole "is without contradiction" and based on "logical reason that one cannot receive something from one's self"); **337 State v. Doster , 247 Or. 336, 340, 427 P.2d 413 (1967) (same); State v. Rogers , 248 Or. 354, 356, 434 P.2d 338 (1967) (same).[9]
In 1971, following the approach of the Model Penal Code and the recommendation of the Oregon Criminal Law Revision Commission, the legislature consolidated theft into a single offense and included the act of receiving stolen property as one of the means to commit that offense. See Oregon Criminal Code, Final Draft and Report, § 129 comment A, 137 (1971) (noting incorporation of receiving stolen property into consolidated theft statute); Model Penal Code § 223.6 comment 1 at 231 (same). However, the legislature retitled the crime "theft by receiving" and described the acts that constitute that crime more broadly to include not only "receives" and "conceals," but also "retains" and "disposes of" stolen property. ORS 164.095(1) (defining theft by receiving).
With that background, we return to the relevant text of the crime of first-degree "theft by receiving" committed by "selling" and consider whether that crime extends to acts such as those that defendant committed in this case. Defendant does not contest his conviction by arguing that the evidence was insufficient to establish that he had the requisite criminal intent; nor does he argue that he did not commit misdemeanor theft of the jeans or misdemeanor theft of the money. Rather, defendant contests only the sufficiency of the evidence to establish that he committed first-degree theft under ORS 164.055(1)(c), which, as noted, is a felony.
III. ANALYSIS
In this court, defendant focuses on the meaning of "disposes of" and "selling." As to the former, defendant argues that the legislature used "disposes of" to refer to a means of depriving an owner of property. According to defendant, returning stolen property to its owner does not constitute such a deprivation. Or, put another way, one cannot "dispose[ ] of" property by relinquishing possession or **338 control of that property to its owner. Defendant makes a similar argument as to the word "selling." He contends that the legislature did not use that word to mean a return of stolen property to its owner; rather, it used it to refer to a transfer of goods in the market for stolen goods. Defendant acknowledges that the exchange of stolen goods for cash constitutes "theft" under ORS 164.015, but he argues that such an act does not constitute "theft by receiving" committed by "selling" under ORS 164.055(1)(c) when the goods are transferred to the owner for money.
The state responds that both terms, neither of which is defined by statute, should be given their plain, ordinary meaning. See PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993) (stating principle). To "dispose of" means "to transfer into new hands or to the control of someone else (as by selling or bargaining away)" or to "get rid of" or "throw away." Webster's Third New Int'l Dictionary 654 (unabridged ed. 2002); see In re Conduct of Phinney , 354 Or. 329, 334, 311 P.3d 517 (2013) (defining "dispose of" in the context of theft by appropriation). To "sell" is "to give up (property) to another for money or other valuable consideration: hand over or transfer title to (as goods or real estate) for a price." Webster's at 2061. Thus, the state argues, defendant "dispose[d] of"-that is, relinquished control of-the stolen jeans when he transferred them to department store personnel, and, given that that exchange was for money, he "dispose[d] of" them by "selling."
*209 Defendant acknowledges that his acts may fit within those dictionary definitions. However, he contends, there are aspects of those definitions that do not neatly fit this circumstance. Defendant argues that he did not transfer the jeans "into new hands" or the "control of someone else" when he took them to the employee. Instead, he returned them to their owner. In defendant's view, one does not "dispose[ ] of property of another" by relinquishing possession to the very person who owns it; rather, one "disposes of" stolen property only by throwing it away or transferring it to a third party, thereby conceptually moving the property further away from the owner. As to the term "selling," defendant argues that, although he obtained cash when he returned the jeans, the employee was carrying out an obligation to provide a **339 "refund," not acting as a buyer of goods. Further, defendant contends, "selling" refers to the market for stolen goods, and defendant's act of returning property to its owner did not place property in that market.
Dictionary definitions provide some information about what the legislature intended, but they are not always determinative. See State v. Cloutier , 351 Or. 68, 96, 261 P.3d 1234 (2011) (noting that dictionaries "do not tell us what words mean, only what words can mean, depending on their context and the particular manner in which they are used") (emphasis in original). Here, defendant's arguments about the meaning of the statutory text are plausible, and we look to the context in which its terms were used for assistance.
The most immediate contextual clue to legislative intent is found in the legislature's description of the various acts that constitute theft by receiving-"receives," "retains," "conceals," and "disposes of." Defendant contends that the first three of those listed acts are necessarily committed to the exclusion of the owner. Defendant argues that the term "disposes of" should be given a similar meaning and should be understood to mean the relinquishment of control of stolen property to the exclusion of an owner. See State v. Walker , 356 Or. 4, 15 n. 5, 333 P.3d 316 (2014) (noting that the meaning of words in a statute "may be indicated or controlled by those with which they are associated").
Defendant also detects a similar clue in a defense to theft by receiving. ORS 164.035(3) makes it a defense to theft by receiving "that the defendant received, retained, concealed or disposed of the property with the intent of restoring it to the owner ." (Emphases added.) Defendant argues that that defense is best understood as protecting persons who transfer stolen property to a third party, non-owner, with the intent that the third party return it to the owner. Defendant explains that the act of transferring stolen property to a third party undoubtedly is a criminal act, but the act of returning stolen property to an owner is not. Defendant apparently argues that understanding the defense to be available only to those who transfer property to third parties is consistent with his understanding that a defendant who transfers property to an owner does not **340 "dispose[ ] of" it. Defendant highlights an exchange between Oregon Criminal Law Revision Commission members that is consistent with that argument. After one member asked how a person could dispose of stolen property with an intent to restore it to the owner, another member jokingly responded, "Well, he could give it to his mother to take back to his sister." Tape Recording, Criminal Law Revision Commission, Subcommittee 1, Apr. 6, 1968, Tape 11, Side 2 (statements of Kathleen Beaufait and Bruce Spalding). Another commission member then explained, "You know, *** he could deliver it to some third party *** and maybe have an intent that it go back to the owner." Id. (statement of Sen. John Burns). That exchange, defendant argues, demonstrates that the legislature did not intend theft by receiving to encompass the circumstance in which the thief disposes of property by directly returning it to its owner.
Turning to contextual clues about the meaning of the word "selling," defendant again points to the other words that the legislature used to describe the acts that constitute first-degree theft under ORS 164.055(1)(c) -"buying," "borrowing," and "lending." Defendant contends that those words have market connotations that suggest *210 that the legislature intended first-degree theft to apply only to those who deal in the market for stolen goods. Further, defendant asserts that the legislature's use of the gerund form suggests that it intended to refer to a defendant's continuing conduct (that is, being engaged in buying, selling, lending, or borrowing) rather than a single point in time. Those are indications, defendant argues, that the legislature wanted dealers in a market for stolen goods to be guilty of felony theft and did not consider a one-time return of property to an owner deserving of the same harsh treatment.
The state has a two-fold response. First, the state contends that all of defendant's arguments depend on establishing a legislative intent to limit the plain meaning of the words that the legislature chose to use. Defendant's efforts, the state asserts, fall short. Second, the state argues that many of defendant's arguments would allow an incongruity that the legislature certainly did not intend. That is, defendant's interpretation of ORS 164.055(1)(c) would seem to make liability for that Class C felony turn on the identity of **341 the person who obtains possession of the disposed property. The state contends that the legislature intended to define theft broadly and that this court should not narrow the meaning of the words the legislature selected.
There are aspects of both parties' arguments that are convincing; yet, there is a salient clue that tips the scale towards defendant's position that the legislature did not intend to capture his conduct under ORS 164.055(1)(c). We find it particularly telling that, although the legislature has consolidated the various acts of theft into one crime, it continues to draw distinctions between them. The legislature makes the intent necessary to commit theft-the "intent to deprive another of property or to appropriate property to the person or to a third person"-applicable to all types of theft. ORS 164.015. However, as previously explained, the legislature separately describes in five subsections the types of acts that a thief may commit. In the first subsection of ORS 164.015, the legislature provides that a person commits theft when, with the necessary intent, the person "[t]akes, appropriates, obtains or withholds" property "from an owner thereof." ORS 164.015(1). Although the legislature did not label that type of theft, we will, for ease of reference, refer to subsection (1) as describing "theft by taking." In the subsections that follow theft by taking, the statute provides that a person commits theft when, with the necessary intent, the person commits theft of property lost, mislaid or delivered by mistake; extortion; theft by deception; or theft by receiving. ORS 164.015(2) - (5). The legislature further describes each of those acts in separate statutes. For instance, the legislature defines theft by receiving in ORS 164.095.
To plead or prove a violation of ORS 164.015, it does not matter which type of theft or which particular act of theft a person committed. ORS 164.025(2) - (3) ; Cox , 336 Or. at 293, 82 P.3d 619. But for other purposes it may matter, and matter quite a bit. The type of theft or the particular act a thief commits may determine the applicable degree of theft with which a person may be charged and for which a person may be punished.[10]
**342 For instance, as relevant here, it matters whether defendant engaged in the acts described in ORS 164.015(1), in which case he may be charged with a misdemeanor, or whether he engaged in the acts described in ORS 164.015(5) -and did so by "selling"-in which case he may be charged with and punished for theft in the first degree, a felony. There is some overlap in the acts that constitute theft under those subsections of ORS 164.015, but the structure of the theft statutes indicates that the legislature perceived a difference in those acts and intended to punish them differently under certain circumstances.
When we also consider the legislature's description of the acts that constitute the crime of theft, we discover additional clues that the legislature intended to differentiate between the types of theft and did not necessarily *211 intend, in all instances, to punish theft by taking in the same way that it intended to punish theft by receiving. We begin by noting that the legislature included, as acts of theft by taking in subsection (1), "[t]akes, appropriates, obtains or withholds." ORS 164.015(1). The legislature did not include those acts when it described the crime of theft by receiving in ORS 164.095. Theft by receiving is committed when a person "receives, retains, conceals or disposes of property." ORS 164.095(1). Thus, a person who "takes" property engages in theft by taking, but does not engage in theft by receiving. That is some indication that the legislature intended to distinguish between an initial thief who takes property and a subsequent thief who receives that property.
Another clue is that, when describing theft by receiving in ORS 164.095(1), the legislature requires that the person commit the requisite acts "knowing or having good reason to know that the property was the subject of theft ." (Emphasis added.) The legislature did not include a similar requirement in its description of theft by taking, apparently presuming that an initial thief who steals property will know that he or she is committing theft, but understanding that a person who subsequently receives that property might not.
Those descriptions suggest that the legislature may continue to see distinctions between theft by taking and theft **343 by receiving that were recognized at common law, incorporated into the Deady Code,[11] and confirmed in this court's decisions. That does not necessarily mean, however, that the legislature intended the two types of theft to be mutually exclusive. Although this court has articulated a well-settled rule that the same person cannot be both an initial thief of property-the person who initially steals it-and the subsequent receiver of that property, Carlton , 233 Or. at 297, 378 P.2d 557, it may be possible for the same person to commit acts that constitute more than one type of theft under ORS 164.015. For instance, the legislature includes, in its descriptions of the acts that constitute both theft by taking and theft by receiving, acts that may be common to both types of theft. A person can commit theft by taking if he or she "obtains" or "withholds" property. ORS 164.015(1). Those acts seem similar to, if not coextensive with, "receives," "retains," and "conceals"-acts of theft by receiving. ORS 164.095(1) ; see Webster's at 2627 ("withhold" is "to desist or refrain from granting, giving, or allowing: keep in one's possession or control"); Webster's at 1559 ("obtain" is "to gain or attain possession or disposal of [usually] by some planned action or method"). And the legislature also provides a definition of the word "appropriate" that makes the act of disposing common to both crimes. The word "appropriate" is defined to mean to "[d ]ispose of the property of another for the benefit of oneself or a third person." ORS 164.005(1)(b) (emphasis added). Thus, in describing theft by taking as including the act of appropriating, the legislature describes both theft by taking and theft by receiving as including the act of disposing. The terms that the legislature used to describe those two types of theft demonstrate that, at least to some extent, the acts that constitute those crimes are overlapping.
The state agrees and emphasizes that the legislature's overarching purpose in enacting ORS 164.015 was "to jettison technical distinctions that had plagued the law of **344 theft."[12] The state's argument from that *212 proposition seems to be that, in making theft by receiving by selling punishable as first-degree theft, the legislature was concerned with appropriately punishing certain illegal acts-disposing of stolen property by selling it. The state appears to suggest that the legislature did not see the distinctions between theft by taking and theft by receiving as significant.
We agree that, in some respects, the legislature intended to consolidate the acts of theft and treat them similarly. But the stubborn fact is that the legislature did not make all types of theft described in the consolidated theft statute punishable as a felony under ORS 164.055(1)(c). ORS 164.055(1)(c) requires that the state prove a particular type of theft-theft by receiving. The legislature must have seen some distinction between that and other types of theft and must have decided that theft by receiving was more deserving of a more stringent sanction. It is at least plausible that the distinction that the legislature discerned was a distinction between the classes of thieves that had long been recognized-initial thieves who take property and subsequent thieves who receive that stolen property and resell it. In describing theft by receiving, the legislature describes the acts of persons who know or have reason to know that property "was" stolen. ORS 164.095(1). That context is an **345 indication that, when it singled out theft by receiving for harsher punishment, the legislature had a subsequent receiver, and not an initial taker, in mind.
To further explore the legislature's intent, it is helpful to consult the legislative history. See Gaines , 346 Or. at 172-73, 206 P.3d 1042 (noting use of legislative history). That history demonstrates that consolidation of theft into a single offense was not intended to rid all forms of theft of their pre-consolidation distinctions. In fact, the Model Penal Code, which served as part of the model for Oregon's consolidated theft statute, suggests that substantive differences between the various acts of theft survived consolidation. See Model Penal Code § 223.1 comment 2(b) at 133 ("The purpose of consolidation, therefore, is not to avoid the need to confront substantive difficulties in the definition of theft offenses. The appropriate objective is to avoid procedural problems. Even a consolidated offense * * * will retain distinctions among methods of acquisition and appropriation."). And the commentary to both the Oregon Criminal Code and Model Penal Code supports the idea that a distinction that remains is the one between takers and receivers. See Oregon Criminal Code, Final Draft and Report, § 129 comment A at 137 ("A person found in possession of recently stolen property may be either the thief or the receiver[.]"); Model Penal Code § 223.6 comment 1 at 234 (same).
What we also learn from the legislative history is that, in discussing the inclusion of theft by receiving as a type of theft in ORS 164.015, members of the Oregon Criminal Law Revision Commission discussed initial thieves and receivers as different species of thieves, even though they thought of them as equally culpable. Members noted that receivers "[are] just as bad" and culpable as a those who steal the property in the first place. Tape Recording, Criminal Law Revision Commission, Subcommittee 1, Apr. 6, 1968, Tape 11, Side 2 (statement of project director Donald Paillette); see State v. Garcia , 288 Or. 413, 416, 605 P.2d 671 (1980) (noting that records of the commission's proceedings "provide a rich source for determination of the drafters' intent"). And, in explaining to the Senate committee why the commission considered and rejected the idea *213 of making theft by receiving a felony regardless of the stolen property's value, the project **346 director explained that the commission did not want to provide a harsher penalty for theft by receiving than for the initial theft by taking. Tape Recording, Senate Committee on Criminal Law and Procedure, SB 40, Mar. 5, 1971, Tape 8, Side 1 (statements of Paillette); see also id. (explaining that commission had considered treating "casual" receivers the same as other types of thieves and "professional" receivers more harshly). Those statements suggest that the commission understood there to be a difference between those who take and those who receive stolen property, but intended, for the most part, that theft by receiving be punished as other types of theft were punished.
The commission's proposal for grading thefts largely followed the Model Penal Code's approach, which, in the main, turned on the type or value of the property involved. See Tape Recording, Senate Committee on Criminal Law and Procedure, SB 40, Mar. 2, 1971, Tape 4, Side 1 (statements of Paillette discussing grading based on value or type of property); Tape Recording, Criminal Law Revision Commission, Subcommittee 1, Apr. 4, 1970, Tape 56, Side 2 (statements of Paillette discussing the Model Penal Code's approach); Model Penal Code § 223.1(2) (explaining theft grades). However, the Model Penal Code made theft by receiving a first-degree offense if "the receiver is in the business of buying or selling stolen property." See Model Penal Code § 223.1(2)(a) (making that act a felony). The commission rejected that aspect of the Model Penal Code's approach. Tape Recording, Criminal Law Revision Commission, Subcommittee 1, Apr. 6, 1968, Tape 11, Side 2 (statements of Paillette). The commission believed that people engaged in such business-fences-would be punished for theft in the first-degree without adopting the Model Penal Code provision because fences generally deal in sufficient quantities of stolen property that they would possess stolen property with a value that would qualify for first-degree grading. Tape Recording, Criminal Law Revision Commission, Subcommittee 1, Apr. 6, 1968, Tape 11, Side 2 (statements of Paillette). Thus, the commission adopted grading criteria that turned on objective, non-act specific criteria-the type or value of the stolen property, as well as the circumstances under which the property was misappropriated.
**347 The legislature was not sure that that was the right approach, however. It was concerned that those engaged in the business of buying and selling stolen property might escape first-degree theft treatment because, for example, it could be difficult to show that property in their possession was in fact stolen. See Tape Recording, Senate Committee on Criminal Law and Procedure, SB 40, Mar. 2, 1971, Tape 4, Side 1 (statement of Richard Barton, Portland Study Committee, explaining difficulties in prosecuting fences). That would, in turn, make it harder for the state to establish that the fence was in possession of stolen property with a value sufficient to constitute first-degree theft. Hoping to ensure that fences would be guilty of first-degree theft, the legislature considered making theft by receiving a felony regardless of the monetary value of the stolen property. See Exhibit B, Senate Committee on Criminal Law and Procedure, SB 40, Mar. 5, 1971 (proposed amendments by Portland Study Committee). The commission's project director explained to the legislature that the commission had considered and rejected making theft by receiving a more serious crime than an initial theft, urging against a statute that would punish a nonprofessional receiver of stolen property more harshly than the original thief. Tape Recording, Senate Committee on Criminal Law and Procedure, SB 40, Mar. 5, 1971, Tape 8, Side 1 (statements of Paillette).[13] Yet, ultimately, the legislature added a provision that made theft by receiving a felony, regardless of value, if it is committed by buying or selling stolen property. SB 40 Engrossed Bill (Apr.
*214 8, 1971). That provision became ORS 164.055(1)(c).
From that legislative history, we can discern a legislative intent to distinguish between theft by taking and theft by receiving and to punish the latter crime more harshly when it is committed by selling. We also can discern a legislative intent to make that elevated crime applicable to fences-dealers in the market for stolen goods. That understanding of legislative intent supports defendant's textual **348 and contextual arguments about the meaning of the legislature's chosen text and, at the same time, counsels against the state's proposed interpretation of ORS 164.055(1)(c), which would make any theft that includes an exchange of property for value punishable as a felony.
We conclude that the legislature did not intend theft by receiving committed by selling to include a theft, such as that committed in this case, that is both committed by an initial thief and committed by fraudulently returning property to its owner in accordance with the owner's return policy rather than by selling that property to a third party in the market for stolen goods. As defendant concedes, his act of taking jeans from a store's sales floor and fraudulently returning them for cash constitutes theft. Based on the value of the jeans, that theft is punishable as a misdemeanor under ORS 164.045.[14] But, because defendant was the initial thief and because he returned the property to its owner, rather than selling it to a third party in the market for stolen goods, that crime is not punishable as a felony under ORS 165.055(1)(c). Therefore, it was an error for the trial court to deny defendant's motion for a judgment of acquittal.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.
Kistler, J., concurred in the judgment and filed an opinion, in which Balmer and Duncan, JJ., joined.
KISTLER, J., concurring in the judgment.
This case presents a recurring issue. Defendant took merchandise (a pair of jeans) from the store shelf to the clerk, told the clerk that he had purchased the jeans earlier, and then "returned" the jeans in exchange for their purchase price. The state charged defendant with committing first-degree theft by receiving by selling stolen goods in violation of ORS 164.055(1)(c). I agree with the majority that defendant committed theft. I also agree with the majority that defendant did not commit first-degree theft by receiving. However, I reach that conclusion in a different **349 way than the majority does and, for that reason, concur in the judgment.
Three statutory variations of theft are relevant. Two are found in ORS 164.015, which defines "theft" as including both the modern equivalent of the common-law crime of larceny, ORS 164.015(1), and the modern equivalent of the common-law crime of theft by receiving, ORS 164.015(5). The former requires proof that a person, with the intent to deprive another of property or to appropriate the property, "[t]akes, appropriates, obtains or withholds such property from an owner thereof." ORS 164.015(1). The latter requires proof that, with the requisite intent, a person "receives, retains, conceals or disposes of property of another knowing or having good reason to know that the property was the subject of theft." ORS 164.095(1) ; see ORS 164.015(5) (stating that theft includes theft by receiving as defined in ORS 164.095 ). Finally, ORS 164.055(1)(c), the statutory provision that defendant allegedly violated in this case, elevates the crime of theft by receiving to first-degree theft when a person commits the crime of theft by receiving "by buying, selling, borrowing or lending on the security of the property."
On this record, no reasonable juror could have found defendant guilty of the predicate crime of theft by receiving. See ORS 164.095(1) (defining that crime). The reason for that is straightforward. Defendant did *215 not commit a theft of the jeans until he returned them for cash; that is, picking the jeans up off the shelf and taking them to the store clerk did not constitute theft even if defendant had an intent to appropriate them. It was not until defendant acted inconsistently with the store's superior interest in the jeans by returning them for cash that he committed theft in violation of ORS 164.015(1). The difficulty for the state is that it relies on that same act-returning the jeans for cash-to prove that defendant committed theft by receiving. Theft by receiving, however, requires proof of a prior theft. ORS 164.095(1). Here, there was no prior theft, and the state cannot rely on the same act to prove both crimes.
This opinion starts with the proposition that the act that constitutes theft must precede the act that constitutes theft by receiving. That proposition follows from the text of **350 ORS 164.095(1), which provides that a person commits the crime of theft by receiving when, with the requisite intent, the person "receives, retains, conceals or disposes of property of another knowing or having good reason to know that the property was the subject of theft." (Emphasis added.) As the legislature's use of the past tense makes clear, the theft of the property must precede the person's receipt, retention, concealment, or disposal of it. Otherwise, the person will not know or have good reason to know that the property he or she received, retained, concealed, or disposed of "was" the subject of theft.
The remaining proposition on which this opinion rests-that no theft occurred until defendant returned the jeans for cash-finds its roots in the common-law crime of larceny, which is the source of the current definition of theft in ORS 164.015(1).[1] At common law, larceny required proof that a person misappropriated another's property by taking the property from the other person's possession. Wayne R. LaFave, 3 Substantive Criminal Law § 19.1(a), 69 (3d ed. 2018). Read strictly, that rule meant that a person who was lawfully in possession of property-a bailee, for example-would not commit larceny even if the bailee wrongfully took the property from its owner. See Carrier's Case , YB 13 Edw. IV, f. 9, pl. 5 (Star Ch. and Exch. Ch. 1473), reprinted in 64 Selden Society 30, 31-32 (1945) (noting that problem).
To avoid that problem, the common law developed at least two doctrines that are relevant here. Initially, judges reasoned that the bailee in the Carrier's Case was in possession of the package but not its contents so that, when the bailee broke open the package midway through the bailment and removed the contents, he committed larceny. See id. at 32. Later, in interpreting the crime of larceny, the courts explained that bailees and others who were entrusted with property merely had "custody" of the property while the owner retained "constructive possession" of it. LaFave, 3 Substantive Criminal Law § 19.1(a) at 70-71. When the person with custody of the property misappropriated it, that **351 person committed larceny by taking the property from the owner's constructive possession. Id.
The distinction between custody and constructive possession also was applied in situations, such as this one, where "[a] property owner delivers the property to another person as part of a transaction to be completed in the owner's presence, as where [the property owner] hands a storekeeper a large bill to pay for a small purchase, or hands a jeweler his watch to be appraised while he waits." Id. at 71. In that situation, the "owner [was] said to have 'constructive possession,' while the other person has mere custody, so that, if the latter runs off with it, he [or she] takes [the property] from the owner's possession and so is eligible for a conviction of larceny." Id.[2] As in the Carrier's Case , the *216 crime of larceny occurred at the point when the person took or appropriated the property in violation of the terms on which the person had obtained custody of the property.
Initially, Oregon followed the common law. See State v. Keelen , 103 Or. 172, 182, 203 P. 306, 204 P. 162 (1922) (distinguishing custody from constructive possession in the context of larceny). However, when the Oregon legislature adopted the 1971 Criminal Code, it recognized that a person to whom property is entrusted may have possession over it. See State v. Fries , 344 Or. 541, 549 n. 6, 185 P.3d 453 (2008). Accordingly, when the legislature enacted the theft statutes in 1971, it did not codify the fiction that the person to whom property was entrusted merely had custody of it while the owner retained constructive possession. See id. Rather, for the purposes of the theft statutes, "[t]he legislature defined the 'owner' of property taken to mean 'any person who has a right to possession thereof superior to that of' the person who takes it." Id. (quoting ORS 164.005(4) ). That statutory definition of "owner" recognizes, as the common law did using different terms, that a bailee has possession of property entrusted to him or her but that the owner has a superior right of possession, which the bailee or other person **352 with a lesser possessory right may take or appropriate in a way that constitutes theft. See id. (so observing).
In this case, the jury could find that defendant possessed the jeans-i.e. , exercised dominion and control over them-when he took them off the shelf and brought them to the cash register. However, in doing so, defendant did not take, appropriate, obtain, or withhold the jeans from the owner of the store, who had a superior right of possession. Rather, he did what every store owner hopes its customers will do: Defendant took the jeans to the cash register. It was only when defendant returned the jeans for cash that he acted inconsistently with the owner's superior possessory right. Only at that point did defendant commit a theft of the jeans by appropriating their value inconsistently with the owner's superior interest. See ORS 164.005(1) (defining "appropriate" as "[e]xercis[ing] control over property of another *** under such circumstances as to acquire the major portion of the economic value *** of such property").
The act that constituted a theft of the jeans-returning them for cash-is the same act on which the state bases its claim that defendant received stolen property by disposing of it. As explained above, however, the text of ORS 164.095(1) makes clear that the theft of property must precede and be separate from the act that constitutes theft by receiving. Both crimes cannot be based on the same act. For that reason, defendant did not commit the predicate crime of theft by receiving. It follows that defendant could not have committed the greater crime of theft by receiving by selling.
It is necessary to address one final issue. In this case, defendant conceded in the Court of Appeals that the theft occurred when he removed the jeans from the shelf with the intent to appropriate them. More specifically, relying on the Court of Appeals decision in State v. Rocha , 233 Or. App. 1, 225 P.3d 45 (2009), defendant conceded that the act that constituted theft preceded the act that constituted theft by receiving.[3] Even though defendant's concession ordinarily **353 would preclude my following the statutory interpretation set out above, the majority accepts defendant's concession and still concludes that his actions did not constitute theft by receiving by selling. In these circumstances, defendant's concession does not bar my identifying a different analytical path to the conclusion I share with the majority-namely, that no reasonable juror could have *217 found that defendant's conduct violated ORS 164.055(1)(c). For that reason, I concur in the judgment.
Balmer and Duncan, JJ., join in this opinion concurring in the judgment.

Before the 1971 revision to the Criminal Code, some defendants attempted to challenge their convictions by claiming that the evidence showed that they committed a form of theft different from the one charged in the charging instrument. See State v. Lewis , 248 Or. 217, 220, 433 P.2d 617 (1967) (the defendant argued that he was actually guilty of embezzlement because he had possession of a motel's television sets through his right to use the motel rooms and thus was not guilty of larceny, which requires a trespass to possession); State v. Thompson , 240 Or. 468, 471-72, 402 P.2d 243 (1965) (the defendant argued that, "because he became the equitable owner of the automobile under the conditional contract of sale[,] title in fact passed and he could be guilty only of obtaining property by false pretenses" and not larceny); see also State v. Stuart , 250 Or. 303, 304-05, 442 P.2d 231 (1968) (appeal of demurrer to an indictment charging larceny and embezzlement of the same automobile that was granted on the basis that the charging of embezzlement of the automobile "is so inconsistent" with the charging of possession of a stolen automobile "that if one is true the other cannot be, since in embezzlement the taking is always lawful, while property is 'stolen' only if it is unlawfully acquired").

That is the problem that the legislature intended to fix with the consolidated theft statute. See Paillette, 51 Or. L. Rev. at 535 (stating that prosecutors "will be protected against a finding of a material variance when a conviction is appealed" and that consolidation provides a "procedural simplification [that] will contribute to speedier justice, less crowded dockets, and fewer appeals"); see also Harris , 246 Or. at 618-19, 427 P.2d 107 (noting that appeal had been "caused by Oregon's outdated criminal statutes" and that this court had "gone to some lengths to sustain larceny convictions").

The criminalization of that conduct was created to prevent breaches of the peace, not necessarily to protect private property. LaFave, 3 Substantive Criminal Law § 19.1(a) at 69. Over time-and specifically as manufacturing and business grew-judges saw a need to enlarge the scope of larceny to protect property from various forms of misappropriation and, to do so, expanded the scope of an owner's possession. Id. § 19.1(a) at 69-72. For example, to protect an employer from an employee's misappropriation of the employer's property, judges found that the employee only had custody of the employer's property while the employer retained constructive possession. Id. § 19.1(a) at 70-71. Thus, if the employee misappropriated the property, it was considered to be larceny. Id. However, the judge-made enlargement of larceny only went so far, and many kinds of property misappropriation went unpunished at common law. Id. § 19.1(b) at 72-73. The Model Penal Code offers insight into why judges may have been reluctant to further expand the scope of larceny to include other forms of unlawful property misappropriation:
"At this point in the chronology of the law of theft, about the end of the 18th century, a combination of circumstances caused the initiative in the further development of the criminal law to pass from the courts to the legislature. Among these circumstances were the general advance in prestige and power of parliament and the conversion of the idea of 'natural law' from an instrument for judicial defiance of monarchy to a restraining philosophy envisioning judges as interpreters of immemorial custom rather than framers of policy. Perhaps the most direct influence of all was a revulsion against capital punishment, which was the penalty for all theft offenses except petty larceny during much of the 18th century. The severity of this penalty not only made the judges reluctant to enlarge felonious larceny but also may account for the host of artificial limitations that they engrafted on the offense ***."
Model Penal Code § 223.1 comment 2(a) at 128-29 (Official Draft and Revised Comments 1980). Accordingly, Parliament stepped in and created new crimes that proscribed the other forms of property deprivation that fell outside the scope of larceny. LaFave, 3 Substantive Criminal Law § 19.1(b) at 73-74. According to LaFave, "matters would have been simpler for us in the United States *** if Parliament had stretched larceny rather than creating new crimes" because the dividing lines between them often resulted in difficulties in prosecuting thieves. Id. § 19.1(b) at 74.

"If any person shall steal any goods or chattels, or any government note, or bank note, promissory note, or bill of exchange, bond or other thing in action, or any book of accounts, order or certificate concerning money or goods due or to become due, or to be delivered, or any deed or writing containing a conveyance of land or any interest therein, or any bill of sale or writing containing a conveyance of goods or chattels or any interest therein, or any other valuable contract in force, or any receipt, release or defeasance, or any writ, process or public record, the property of another, such person shall be deemed guilty of larceny ***." General Laws of Oregon, Crim. Code, ch. XLIV, § 547, p. 536 (Deady 1845-1864) (repealed 1971).

"If any person shall buy, receive or conceal, or attempt to conceal, any stolen money or property, knowing or having good reason to believe the same to be stolen, such person, upon conviction thereof, shall be punished ***." General Laws of Oregon, Crim. Code, ch. XLIV, § 556, p. 538 (Deady 1845-1864) (repealed 1971).

See, e.g., People v. Ceja , 49 Cal. 4th 1, 4-5, 229 P.3d 995, 997, 108 Cal.Rptr.3d 568 (2010) (noting principle that "it is 'logically impossible for a thief who has stolen an item of property to buy or receive that property from himself' "); State v. Bleau , 139 Vt. 305, 308, 428 A.2d 1097, 1099 (1981) (same); Leon v. State , 21 Ariz. 418, 420, 189 P. 433, 434 (1920) (same).

Under the statute that described the crime of receiving stolen property, a person could be convicted of that crime by "concealing" property that he or she stole. Carlton , 233 Or. at 297-98, 378 P.2d 557. However, such a person could not also be convicted of the initial theft of that property. Id. at 299, 378 P.2d 557.

For example, extortion is a Class B felony regardless of the value or nature of the property stolen. ORS 164.075(2). Extortion must be specifically alleged in the charging instrument. ORS 164.025(2).

The provisions from the Deady Code were later codified. The text of the provision covering the receipt of stolen property seems to have remained the same. Compare General Laws of Oregon, Crim. Code, ch. XLIV, § 556, p. 538 (Deady 1845-1864), with former ORS 165.045 (1969), repealed by Or. Laws 1971, ch. 743, § 432 (making it a crime to receive stolen property).

The state notes that in Cox , 336 Or. 284, 82 P.3d 619 (2003), the defendant was convicted of theft by receiving even though he was the initial thief. In Cox , the defendant stole over $10,000 worth of aluminum from a company in Marion County and then had a scrap metal dealer in Multnomah County help him transport it. Id. at 286, 82 P.3d 619. Defendant was charged in Multnomah County with aggravated theft by receiving under ORS 164.057(1). Id. at 287, 82 P.3d 619. That statute provides that a person commits the crime of aggravated theft in the first degree if the person commits first-degree theft as defined in ORS 164.055 and the value of the property is $10,000 or more. ORS 164.057(1). The defendant entered a guilty plea to aggravated theft by receiving, but, before he did so, he was indicted in Marion County for aggravated theft, but not for aggravated theft by receiving, based on the same incident. Cox , 336 Or. at 287-88, 82 P.3d 619. Defendant's motion to dismiss the Marion County charge was denied, and he was later convicted in that case. Id. at 288, 82 P.3d 619. Defendant appealed the Marion County case, arguing that he had been prosecuted twice for the same offense in violation of an Oregon statute and the Oregon Constitution. Id. at 290, 82 P.3d 619. This court agreed with the defendant's statutory argument and reversed his conviction in the Marion County case. Id. at 293-95, 82 P.3d 619. Thus, the state is correct that the defendant in Cox was convicted of theft by receiving despite having been the one who committed the initial theft by taking. However, the defendant entered a guilty plea to that charge. Id. at 287, 82 P.3d 619. We were not called upon to opine whether the defendant could appropriately be convicted of theft by receiving based on the specific facts in that case.

The legislature asked the director to draft and submit an amendment that addressed the committee's concerns. Tape Recording, Senate Committee on Criminal Law and Procedure, SB 40, Mar. 5, 1971, Tape 8, Side 1 (statement of Sen. Kenneth Jernstedt). However, it does not appear that the amendment was ever drafted or that, if it was, the legislature ever discussed the issue again during the course of its meetings.

Defendant acknowledges that the allegations in the indictment, the trial court's findings, and defendant's admission that he committed theft by taking "plausibly allow for a remand" for entry of two convictions for misdemeanor theft by taking and resentencing. The state agrees with defendant on that point.

As discussed above, a person commits theft in violation of ORS 164.015(1), if the person, with the intent to deprive another of property or to appropriate the property, "[t]akes, appropriates, obtains or withholds such property from an owner thereof."

That was so even though the person to whom the property was given would ordinarily have sufficient dominion and control over it to possess it. LaFave, 3 Substantive Criminal Law § 19.1(a)(1) at 70. Custody and constructive possession were labels adopted to avoid the definitional problem created by the common law that a person lawfully in possession of property could not be guilty of larceny. Id.

It is difficult to fault defendant for relying on Rocha . The fact pattern in that case is virtually identical to the fact pattern here, and the Court of Appeals held in Rocha that the defendant committed theft when he possessed the merchandise by taking it off the shelf and moved it a short distance. 233 Or. App. at 7-8, 225 P.3d 45. Rocha , however, did not consider that, when another person has a superior possessory interest, it is not necessarily sufficient to exercise dominion and control over the property. Rather, in circumstances where the defendant lawfully obtains possession, he or she must act in a way that is inconsistent with the terms on which he or she possesses the property and, in doing so, must take or appropriate it. It is only at that point that the theft occurs.